Estate of Matthew I. Heinold, Deceased, Virgil W. Heinold, Executor v. Commissioner.
Estate of Heinold v. Commissioner
Docket No. 439-62.
United States Tax Court
T.C. Memo 1965-6; 1965 Tax Ct. Memo LEXIS 325; 24 T.C.M. (CCH) 26; T.C.M. (RIA) 65006; January 15, 1965
*325 At the date of his death, decedent owned 25,000 shares of stock in a closely held corporation which was in the process of "going public." Held: 1. Fair market value of such shares was $8 per share. 2. Such shares do not qualify for the marital deduction because not shown to be held jointly by decedent and his surviving spouse. 3. The proceeds of certain insurance policies do not qualify for the marital deduction because not shown to have passed to decedent's surviving spouse. John L. Carey, Associates Bldg., South Bend, Ind., and Delmar R. Hoeppner for the petitioner. Jay B. Kelly for the respondent. TRAIN
Memorandum Findings of Fact and Opinion *326 TRAIN, Judge: Respondent determined a deficiency in petitioner's estate tax in the amount of $56,314.43. Petitioner claims an overpayment in the amount of $2,442.62. The issues which remain for decision after certain concessions are as follows: (1) What the fair market value of 25,000 shares of Heinold Elevator Company, Inc., stock was at the date of decedent's death; (2) Whether these shares qualify for the marital deduction allowance; and (3) Whether the proceeds of certain life insurance policies qualify for the marital deduction *327 allowance. Respondent also questions the amount of administration expenses allowable and proof of payment thereof. This matter will be disposed of under Tax Court Rules 50 and 51. Findings of Fact Some of the facts have been stipulated and are hereby found as stipulated. Matthew I. Heinold (hereinafter sometimes referred to as decedent) died testate on September 13, 1958, leaving Alice M. Heinold as his surviving spouse. At all times material to this proceeding decedent and Alice M. Heinold were husband and wife. Decedent's son, Virgil W. Heinold (hereinafter sometimes referred to as Virgil), was appointed executor of decedent's estate and obtained letters testamentary. Virgil filed the Federal estate tax return on behalf of the estate with the district director of internal revenue at Indianapolis, Indiana, on September 15, 1959. At his death, decedent was a resident of Kouts, Indiana, a rural community of approximately 950 persons located about ten miles from Valparaiso, Indiana, and 45 minutes from Chicago by rail. The only substantial business in Kouts is the Heinold Elevator Company, Inc., (hereinafter sometimes referred to as the corporation) which was started by decedent *328 as a sole proprietorship in 1937 when he purchased a deserted flour mill, rebuilt it, and started a grain business as the Heinold Elevator Company (hereinafter sometimes referred to as the company). In 1939, the company purchased another grain elevator four miles west of Kouts in Aylesworth, Indiana. In 1942, the original Kouts flour mill was destroyed by fire. A new grain elevator was built in Kouts in 1943 which has been operated through the present time; also, a number of new trucks were added. Virgil and his father, the decedent, operated the company together as joint managers from the time the business was founded. On January 1, 1947, decedent made a gift of 25 percent interest in the company to each of his three children: Virgil, Fern Wadsworth (later widowed and now named Fern Antrim) and Dorothy Stewart. Decedent and his three children are hereinafter sometimes referred to as the partners. Decedent filed a Federal gift tax return in which he valued each 25 percent interest at $24,656.38. Between 1946 and 1952, the management of the company felt the need to expand its grain storage facilities due to the Federal grain program. Many banks in the Indiana and Illinois area were *329 contacted to obtain financing, but the only source of funds available was the Reconstruction Finance Corporation (hereinafter referred to as RFC). On February 21, 1951, the company obtained a $160,000 loan from RFC, and in 1952 constructed a concrete, fireproof, modern grain storage plant at Aylesworth. Additional storage facilities were added in 1955. The original plant had a storage capacity of approximately 192,000 bushels and the 1955 addition had a 200,000-bushel capacity. In 1953, the company purchased an old grain elevator with a 20,000-bushel capacity from a competitor in Kouts. The company used this elevator to store approximately 50 tons of feed. Also in 1953, the company purchased a combination office building and warehouse. In 1956, the company purchased a grain elevator at Boone Grove which had a 12,000-bushel capacity. From January 1, 1947 to January 12, 1956, the company was operated as a partnership without a formal partnership agreement. On January 12, 1956, such an agreement was executed by the partners. Contemporaneously, a partnership purchase (buy-sell) agreement was executed wherein it was agreed that the price of each partner's interest was to be $105,000. *330 This price was approximately equal to the then book value, after depreciation, of the company's assets. In September 1956, the Kouts feed mill was destroyed by fire. The bulk of the fire insurance proceeds received was used to retire the RFC loan. After attempting to secure additional financing to rebuild, the company applied for a $250,000 ten-year loan from the Small Business Administration (hereinafter sometimes referred to as SBA) on October 29, 1956. In this application the company's net worth was stated to be $464,423. The company stated that the proceeds of the $250,000 loan were to be applied so that approximately one-half would be used for equipment and machinery, three-tenths for building, and two-tenths to restock inventory. The loan was approved by SBA in December 1956. Construction of the new feed mill was commenced in April 1957 and completed in January 1958. The mill is one of the most modern in the Midwest and is equipped with many pushbutton conveniences. Its warehouse capacity is 300 tons of bulk storage and 700 tons of bag feed storage. It is capable of pelleting (making feed in particle sizes called pellets) 16 tons of feed per hour, which is four times the capacity *331 of the feed mill that was destroyed by fire. Since 1952, the corporation has manufactured its own brand of feed under the brand name "Square Deal." The company was actively engaged in the expansion of its grain mill facilities at the time of the fire in September 1956. It constructed a 75,000-bushel grain-storage quonset at the Aylesworth site in 1956. The total grain-storage capacity of the company in 1958 at its six facilities was approximately 555,000 bushels. In early 1958, the company experienced a shortage of working capital. The partners investigated banks and insurance companies in an attempt to secure financing but without success. Ultimately, the partners decided to explore the possibility of incorporating and "going public." They consulted Frederick R. Tourkow (hereinafter sometimes referred to as Tourkow), a Fort Wayne attorney and financial adviser, who explained the various aspects of incorporation and public issuances. The corporation's charter was filed with the secretary of state of Indiana on April 24, 1958, showing the following incorporators: Virgil, decedent, Harold Heinold, Fern Antrim, Dorothy Stewart, Fred Smoke, Max Skinkle, Tourkow, John J. Broertjes, *332 Michael G. DeGrazia, Erwin Fritz, Lester E. Nuest, Margaret L. Heinold, Harold Fritz, and Ray Dahl. The corporation's declaration of paid-in capital was executed by Virgil, Tourkow, decedent and Ray Dahl on April 28, 1958, and showed paid-in capital of $250,000. On May 1, 1958, the corporation agreed to assume the liabilities of the company on a $250,000 note. The assumption agreement was approved and accepted by the Farmers' State Bank to which part of the loan was due and by officials of SBA. The corporation acquired the company assets for which the four partners each received 25,000 shares of $1 par value common stock. Excluded from the company's assets and retained by the partners were: $7,745.14 of amounts receivable from the Federal government for storage, cash of $10,190.99, and accounts receivable of $17,821.99. The acquisition of and assumption of liabilities were in accordance with an April 1958 independent appraisal of the company assets. The value of the company assets established by that appraisal was: PROPERTY, PLANT AND EQUIPMENT
Land
$ 11,000
Elevators and buildings
776,299
Machinery and equipment
228,162
Automotive equipment
41,022
$1,056,483
*333 The valuation of the fixed assets was written up $343,097.86 above the company's basis to reflect their appraised market value in April 1958. On May 1, 1958, the corporation had issued and outstanding a total of 118,180 shares of stock, which total includes 18,180 shares of stock sold to close friends and good customers at $8.50 per share. The 11 purchasers at this price and the original partners became incorporators. On May 27, 1958, the corporation entered into a "best efforts" underwriting agreement with Northwestern Investment, Inc., (hereinafter sometimes referred to as Northwestern) whereby the latter would use its best efforts to sell up to 50,000 shares of the corporation's $1 par value common stock within one year from the date on which the Indiana Securities Commission entered its order of approval. Tourkow was the president and sole shareholder of Northwestern. The agreement further provided that salesmen would be licensed by Northwestern and would be under the jurisdiction of Virgil. Northwestern was to receive 15 percent of the $10 per share gross selling price. From this amount the salesmen licensed by Northwestern were to receive 8 percent. Virgil was to receive *334 2 percent for directing the salesmen's activities as well as 8 percent on sales which he made. The prospectus used by the corporation was stamped with the legend: "THESE ARE SPECULATIVE SECURITIES," pursuant to the Indiana Securities Commission rules for new corporations. The offering was "to bona fide citizens of Indiana only, who are acquiring for a purpose other than resale to nonresidents," and was not registered with the Securities and Exchange Commission. The public offering was subject to the rights of creditors to apply current indebtedness to the purchase of the corporation's stock at a price of $8.65 per share from June 15 to July 15, 1958. It was not anticipated that creditor conversions would exceed $100,000 of the public offering. The total anticipated offering to the general public was 40,000 shares of $1 par value common stock of the corporation at a price of $10 per share. On July 14, 1958, creditors of the corporation purchased 4,175 shares of stock at the price of $8.65 per share as follows: Number of
Name
Shares
Ross and Blanche Skinkle
200
James and Frances Skinkle
200
Justin O. Shaun
200
Fern Antrim
1,400
Virgil and Ruth Heinold
1,600
George N. Wadsworth
575
4,175
*335 The first sale of stock to the general public was made on July 18, 1958. As of the date of decedent's death, there had been sales of 9,190 shares in 77 transactions. Total sales of the stock to the general public for the period July 18, 1958 to June 18, 1959, amounted to 38,712 shares at $10 per share. Total sales for this period involved 348 transactions and approximately 250 to 300 individuals. Including the shares sold to creditors, the public offering resulted in the sale of 42,887 shares of the corporation's common stock out of the 50,000 shares offered to the public. On May 15, 1959, Virgil issued a "confidential" memorandum to all department heads of the corporation and to Northwestern stating that recent stock sales had been sufficient to adequately finance current operations as well as a new wholly-owned subsidiary, Animal Health, Inc., and that no further stock subscriptions should be accepted after June 15, 1959. Substantially all of the purchasers of the "public" sales were made to purchasers residing in the immediate trading area of the corporation who were corporate personnel, their relatives and friends, or corporate creditors and customers. Each salesman *336 of the corporation's stock was furnished with a sales kit prepared by Tourkow which was shown to most of the prospective stock purchasers. This sales kit contained portions of the prospectus filed with the Indiana Securities Commission, a copy of a March 1958 magazine article describing the new Kouts feed mill, and various pictures and descriptions of the corporation's facilities and employees. The only financial data in the sales kit was the asset side of the May 1, 1958, balance sheet and a graph which showed feed sales of $103,000 in 1947, $104,000 in 1950, $384,000 in 1953, $510,175.59 in 1957 and projected a "Management Estimate" of $1 million in 1958. The prospectus, which was shown to most of the prospective investors, indicated total sales of $2,602,000 in 1955, $2,739,000 in 1956 and $2,702,000 in 1957. During the sale of the stock, the salesmen indicated that the corporation intended to pay dividends of $.40 per share annually, which would provide investors a return of 4 percent on the offering price of $10. The book value of the corporation's capital stock on May 1, 1958, was $7.71 per share, based upon appraised value of the corporate assets. Based upon the depreciated *337 original cost basis of the assets, the book value was $4.81 per share. On September 13, 1958, the fair market value of the 25,000 shares of the corporation's stock held by decedent was $8 per share. The corporate stock certificates were received by Tourkow about July 26, 1958. Certificate No. 2 of the corporation was originally prepared at Tourkow's office in Fort Wayne in the name of Matthew I. Heinold. Subsequently, Tourkow recommended to Virgil, Raymond Dahl (financial counsel to and a director of the corporation and vice president of the Kouts State Bank, of which decedent was president), or both, that decedent should hold his stock jointly with his spouse. Tourkow also made similar recommendations for the other three partners and wrote a letter dated May 23, 1958, to the corporation requesting the names of the spouses of the four partners so that their stock could be registered as being owned jointly. On May 26, 1958, Virgil replied to Tourkow's letter, giving the spouses' names as Alie M. Heinold, Ruth E. Heinold, Leonard B. Antrim and Doyne B. Stewart. As introduced into evidence, stock certificate No. 2 of the corporation bears the typewritten names "Matthew Heinold & *338 Alice Heinold" as owners of the 25,000 shares which the certificate represents. It has been stampted after these names "as joint tenants with right of survivorship and not as tenants in common," and was dated by typewriter the "First" day of "May" A.D. 19"58". A different typewriter was used to type each of the names on the certificate, and the date has been retyped over an erasure of another date. The Kouts State Bank was appointed in May 1958 as the transfer agent for the public issue of the corporation's stock. Raymond Dahl of the bank caused the joint tenancy stamp to be placed on the certificate after Tourkow had delivered it to him in August 1958. The stock receipt form, pasted on the stock certificate stub in the stock certificate book, was signed with decedent's name but it has been stipulated that the signature was not that of the decedent. The schedule of decedent's assets filed with the Indiana inheritance tax appraiser shows decedent's surviving spouse as having only a life estate in decedent's interest in the corporation and this tax was determined on the basis of the net estate, with decedent's surviving spouse having only a life estate therein. Schedule B of the *339 Federal estate tax return filed on behalf of decedent's estate lists 25,000 shares of the corporation's stock as being owned by decedent at the time of his death. These shares are not listed under schedule E as jointly-owned property. On June 9, 1959, decedent was certified by the corporation's secretary, Fern Antrim, to be the record owner of 25,000 shares of the corporation's stock as of May 9, 1959. On August 12, 1959, stock certificate No. 428 was issued to "Alice Heinold, Life Tenant-Payable on death to Virgil W. Heinold, Fern Antrim and Dorothy Stewart." This replaced stock certificate No. 2, which was canceled. Both certificates were for 25,000 shares. A dividend check of the corporation in the amount of $5,000 was issued on November 15, 1958, naming decedent alone as the payee. A similar check was issued on July 15, 1959, naming Alice M. Heinold as payee. Decedent's will, executed January 12, 1956, bequeathed his one-fourth interest in the company to his wife for life and then to his children equally. The partnership purchase agreement, also dated January 12 1956, provided that each partner, with the exception of decedent, had caused his life to be insured under certain *340 life insurance policies with the partnership as the named beneficiary. Decedent was excepted from this provision since his interest in the partnership, in the event of his death, would pass to the remaining partners under his will. At his death, decedent's life was insured as follows: Equitable Life Assurance Society
of the United States
Policy No. 10363957
$ 6,526
Franklin Life Insurance Company
Policy No. 958361
22,500
Lineoln National Life Insurance
Company
Policy No. 705656
7,500 These policies are hereinafter referred to as the Equitable, Franklin and Lincoln policies, respectively. U.S. Treasury Department forms 712 (life insurance statement) filed with decedent's Federal estate tax return indicate the following information: The Equitable policy was issued on April 7, 1937. The beneficiaries are listed as "The Farmers State Bank of Valparaiso, Indiana, as Assignee and the Insured's wife, Alice M. Heinold, jointly." The Franklin policy was issued on February 16, 1951, and the Lincoln policy on November 9, 1943. The named beneficiary of both of these policies was Alice M. Heinold. The Equitable, Franklin and Lincoln policies were all assigned to the *341 Farmers' State Bank, Valparaiso, Indiana, as collateral security for the $250,000, 10-year SBA loan to the company which was approved in December 1956. The SBA participated in the loan to the extent of 90 percent. The loan agreement was executed by the four partners on January 24, 1957. The Lincoln policy was assigned on January 30, 1957. Decedent signed the assignment form as the insured and the four partners signed in behalf of the company in the space provided for the beneficiary's signature. The Franklin policy was assigned on February 12, 1957. Decedent signed the assignment form as the insured and Alice M. Heinold and the three partners other than decedent signed in the space provided for beneficiary's signature. The reverse side of the assignment form bears a stamped legend: "Received change of beneficiary, February 28, 1957, 3 P.M." At the date of decedent's death, the above assignments were in effect. At a meeting of the corporation's board of directors on October 22, 1958, the following resolution was unanimously passed: RESOLVED, that in the event that the life insurance policies on the life of Matthew Heinold, which were owned by Matthew Heinold personally and *342 which are payable to Mrs. Alice Heinold, his wife, as beneficiary, are applied by the Small Business Administration to the payment of the mortgage loan made by the Small Business Administration to the partnership which was the predecessor of this corporation, and which mortgage loan this corporation assumed, that the corporation and its proper officers are hereby authorized to execute a note to the said Mrs. Alice Heinold in the amount paid on said insurance policies to the said Small Business Administration or its designee. At a meeting of the corporation's board of directors on November 19, 1958, the following resolution was unanimously adopted: BE IT RESOLVED by the Board of Directors of the Heinold Elevator Company, Inc., that the Heinold Elevator Company, Inc. reimburse out of corporate funds, to Alice Heinold widow of Matthew I. Heinold, deceased, any monies or funds that may be applied on any corporate indebtedness of the Heinold Elevator Company, Inc., as a result of any payments to the insurance companies on the mortgage indebtedness of the Corporation, and upon policies of insurance on the life of Matthew I. Heinold, which were heretofore assigned as collateral for any *343 mortgage indebtedness of the Heinold Elevator Company, a Partnership, or the Heinold Elevator Company, Inc. The proceeds of the insurance policies on decedent's life were received by the corporation and paid to the SBA and the Farmers' State Bank in the amount of $36,534.95 on December 16, 1958. Opinion Issue 1 The first issue for decision is the fair market value of the 25,000 shares of the corporation's stock held by decedent at his death and thus includible in his gross estate under section 2031(a) of the 1954 Code. [1] Respondent contends that the stock sales to the public at $10 per share are the best evidence of fair market value. On decedent's estate tax return the stock was valued at $3.21 per share. Petitioner now contends that the value is $3.17 per share. We have found as a fact that the value was $8 per share. *344 The determination of the value of the stock is essentially a question of fact. Fox River Paper Corporation v. United States, 165 F. 2d 639 (C.A. 7, 1948); Hamm v. Commissioner, 325 F. 2d 934 (C.A. 8, 1963), affirming a Memorandum Opinion of this Court. In making our ultimate finding as to value, we have considered especially the sales to the public; the book value of the corporate assets; the corporation's past and projected earnings and its stature in the Kouts, Indiana, area; the large number of shares involved (plus the fact that the shares were not qualified for sale to the public); and the economic and familiar relationships of the public purchasers. We have carefully examined the testimony of petitioner's expert witnesses and the various exhibits which have been submitted to substantiate their estimates. On the basis of the above, we have used our best judgment to arrive at the price at which we believe that "the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having *345 reasonable knowledge of relevant facts." Section 20.2031-1(b), Estate Tax Regs. See also Rev. Rul. 54-77, 1954-1 C.B. 187 and Rev. Rul. 59-60, 1959-1 C.B. 237. The factual situation in the instant case is somewhat unusual. At decedent's death, the corporation was neither closely held nor publicly held in the true sense of those concepts; it was a family enterprise in the process of going public by selling approximately one-third of its stock, in small lots, to a public which consisted almost entirely of individuals in the Kouts, Indiana, area who were related to the Heinold family or to company employees, either by marriage or by economic ties. When he died, decedent held 25,000 of the 131,545 shares outstanding, or approximately 19 percent. His three children each held a similar amount. Less than one-quarter of the corporation's stock was publicly held, and if the entire public issue had been disposed of, decedent and his three children would have still owned two-thirds (100,000 of 150,000 shares) of the outstanding stock. Most of the public purchases were in small blocks. We have taken into account that $10 per share was paid by these public purchasers, *346 but we believe that their close geographic, economic and familial relationships to the Heinolds and the corporation and its employees, together with the relative size of the purchases when compared to decedent's holding, indicate that the fair market value of decedent's shares was less than $10 each. In addition, the disruptive effect which the disposition of decedent's shares would have had upon the sales to the public then in progress (and limited number of prospective "public" purchasers) make it unlikely that decedent's shares would have or could have been sold to the public for $10 per share at the date of decedent's death. On the other hand, we believe that the three to four dollar values ascribed to decedent's stock by petitioner's expert witnesses are entirely too low. We are attempting to ascertain a market value which is fair, rather than a fair value in the eyes of an expert investor. See Estate of Millie Langley Wright, 43 B.T.A. 551 (1941). Although respondent did not present any expert witnesses, the fact that so many purchasers paid $10 per share is to us strong evidence of fair market value. Elmhurst Cemetery Co. v. Commissioner, 300 U.S. 37 (1937); *347 Fitts' Estate v. Commissioner, 237 F. 2d 729 (C.A. 8, 1956), affirming a Memorandum Opinion of this Court. While the purchasers may have paid $10 per share partially because of their economic or familial relationships to the corporation and its employees, it appears from the record before us that their overriding motivation was the economic benefits which they hoped to receive as shareholders from the future earnings of the corporation. Similarly, the purchase of shares by creditors at $8.65 per share indicates a value well in excess of petitioner's experts' estimates. Virgil's attempts to discredit the corporation's prospectus and sales kits as containing insufficient information and to explain away Virgil's "confidential" memorandum to the salesmen as a "sales gimmick" are unpersuasive. We believe that prospective purchasers had a reasonable amount of knowledge of relevant facts necessary to make a decision on purchasing the corporation's stock at $10 per share. The corporation was the only substantial industry in Kouts and undoubtedly enjoyed a good reputation among the purchasers, almost all of whom were from the immediate vicinity. As we said in the Wright case, *348 supra, at p. 556: If it were always necessary to discover whether every material fact was known to the public before stock exchange prices could be relied upon in fixing fair market value, and indeed to determine what factors are and what are not material in the operations of the whole body of the trading public, it would, we think, be impossible for administrative officers or taxpayers to make an intelligent approximation of their own situation. * * * We believe that Virgil's memorandum was what it purported to be, a notification to the salesmen that the corporation had secured adequate financing for current operations so that further sales were not required. Even if it also served as an added incentive for prospective purchasers to act before the June 15, 1959, deadline, we do not think that this was its major purpose. Based upon the entire record, we have found the fair market value of decedent's stock to be $8 per share. Issue 2 The second issue for decision is whether the 25,000 shares of the corporation's stock represented by stock certificate No. 2 qualify for the marital deduction under section 2056(a). [2] For the reasons hereinafter stated, we hold that petitioner *349 has failed to show that this stock was held jointly by decedent and his surviving spouse at the time of decedent's death. Thus it does not qualify for the marital deduction. When the partners decided to incorporate the company, each agreed to receive the corporate stock certificates in his own name. A short time later Tourkow suggested that joint ownership of the stock by the partners and their spouses would be advisable. On May 23, 1958, he requested the spouses' names from the corporation in order that the certificates might be issued to reflect such joint ownership. Virgil *350 supplied the spouses' names in a letter dated May 26, 1958. Decedent's spouse's name was listed as Alice M. Heinold. Sometime in July 1958 the stock certificate book was received by Tourkow and stock certificates were prepared in Tourkow's office in Fort Wayne. In August 1958 Tourkow delivered the certificates, including certificate No. 2, to Raymond Dahl at the Kouts State Bank. At some time thereafter certificate No. 2 was changed by adding the name "Alice Heinold" next to which was rubber stamped "as joint tenants with right of survivorship and not as tenants in common." This stamp was placed on the certificate at Dahl's office at the bank and not at Tourkow's office where Alice's name was added. The date of issuance was changed to the first of May 1958 by erasing the date which was originally on the certificate. It is petitioner's contention that the joint names on the stock certificate accurately demonstrate the fact that the stock was jointly owned by the decedent and his spouse. There are too many discrepancies in the record to permit this conclusion. Although it has been established that Tourkow recommended the use of joint tenancies to the partners, there is absolutely nothing *351 in the testimony of petitioner's witnesses to show that decedent ever took any action with respect to such a suggestion. Their testimony is inconclusive as to exactly who directed the addition of decedent's spouse's name on the stock certificate and when that addition was made. The addition of decedent's spouse's name without her middle initial indicates that the addition was not made pursuant to Virgil's letter to Tourkow. Alice's name was added with a typewriter different from that used for decedent's name; the joint ownership stamp was not shown to have been placed on the certificate at decedent's direction; and the date of the certificate had been altered. Further, the receipt for the stock certificate, which was pasted on the stub in the stock certificate book, although signed with decedent's name was not signed by the decedent. No gift tax return was ever filed on account of this change from individual to joint tenancy. These irregularities with regard to the certificate lead us to doubt its accuracy. The noninclusion of the stock as jointly-owned property in schedule E in decedent's Federal estate tax return and Indiana inheritance appraisal is explained by petitioner on brief *352 as resulting from a mistaken factual assumption that the certificate was held individually by decedent at the time of his demise, so as to be subject to the provisions of his 1956 will wherein he had bequeathed his one-fourth interest in the (then) partnership to his wife for life with the remainder to his children. We are not satisfied that this noninclusion was a mistake or that it was in fact an error. Decedent's daughter, the corporation's secretary, certified on June 9, 1959, that decedent was the record owner of 25,000 shares of the corporate stock as of May 9, 1959. Furthermore, on August 12, 1959, certificate No. 2 was canceled by the corporation and a new certificate, No. 428, was issued to Alice M. Heinold, decedent's spouse, as life tenant with his children as remaindermen. It appears to us highly unusual as well as unlikely, if this stock were in fact jointly owned by decedent and his spouse at the time of decedent's death on September 13, 1958, that either of the above acts would have taken place. The issuance of the new certificate with decedent's spouse as a life tenant reflects the disposition provided for by decedent in his 1956 will. The corporation paid its first *353 dividend on November 15, 1958. A dividend check in the amount of $5,000 named decedent alone as payee. A similar check issued July 15, 1959, named Alice M. Heinold as payee. This indicates to us that record ownership of certificate No. 2 was changed at some time after decedent's death, probably after the June 9, 1959, certification of shareholders by the corporation's secretary. The above irregularities cast serious doubt on the reliability of the stock certificate as a true reflection of the ownership of the shares in question. We do not know if these irregularities were due to a failure of communication between decedent, Virgil, Tourkow, Raymond Dahl and others, or to a deliberate effort to falsify the facts in this case in order to qualify these shares for the marital deduction. We need not decide this matter since in either event petitioner has failed to persuade us that the stock in question was jointly owned so as to qualify for the marital deduction. Issue 3 The final issue for decision is whether the proceeds of certain life insurance policies which have been included in decedent's gross estate qualify for the marital deduction. Sections 2056(a), supra, and 2056(e)(7). *354 [3]
Respondent contends that the proceeds of the policies did not pass from the decedent to his surviving spouse because "the assignments of the life insurance policies to the bank as collateral security on a partnership liability by a partner, with the other partners signing as beneficiaries, indicates an effective * * * change of the beneficiary at the time the S.B.A. loan was obtained by the partnership." Petitioner contends that the proceeds of the three insurance policies did pass to decedent's surviving spouse and that their assignment as collateral on the partnership's debt was for security purposes only. Petitioner has the burden of proving the factual predicate for its position; on the record before us, we hold that it has failed to sustain this burden. In 1957, the company obtained a loan from the SBA *355 and the Farmers' State Bank. As security for the loan, the company's assets were mortgaged, and three insurance policies on decedent's life were assigned as further collateral. When the company was incorporated on May 1, 1958, substantially all of its assets were transferred to the corporation, which also assumed its liabilities, including liability for the SBA loan. After decedent's death on September 13, 1958, the proceeds of the policies were paid by the insurance companies to the corporation and on December 16, 1958, were applied by the corporation on the outstanding debt to the SBA and the Farmers' State Bank. The board of directors of the corporation had adopted a resolution on November 19, 1958, that decedent's widow be reimbursed for any funds which might be received on decedent's insurance policies and applied on corporate indebtedness. Appended to decedent's Federal estate tax return were three forms 712. Two listed decedent's widow as beneficiary of the policy in question and noted that the policies had been assigned to the Farmers' State Bank. The third listed the widow and the bank as joint beneficiaries. Petitioner contends that this clearly establishes that the estate *356 is entitled to include the proceeds of the policies in computing the amount of the marital deduction. We disagree. The forms 712 are relied upon by petitioner to establish that decedent's widow was in fact the beneficiary of the policies. The policies themselves were never produced. The statements on the forms 712 cannot be used to prove the truth of the matters stated therein. Neither can the resolutions passed by the corporation's board of directors support such a conclusion. The record before us does not establish that decedent's widow was not the beneficiary of the policies, but we note that the proceeds were apparently received by the corporation and were applied against its outstanding debt to the SBA and the bank. Though petitioner states that the corporation executed and delivered its promissory note to decedent's widow to evidence the corporation's purported debt to her, the note was not put into evidence, and the record is devoid of any proof of payment made on such a note. Moreover, even if the note had been paid, there is no convincing evidence that her rights were derived from the policies rather than from an undertaking assumed by the corporation after her husband's *357 death. The signatures of the four partners on the collateral assignment forms further complicate our inquiry. We cannot find on the record before us that the proceeds of the policy "passed" to her within the meaning of section 2056(a). We hold for respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. All Code references are to the Internal Revenue Code of 1954 unless otherwise stated. SEC. 2031. DEFINITION OF GROSS ESTATE. (a) General. - The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal. tangible or intangible, wherever situated, except real property situated outside of the United States. * 20.2031-1 [Estate Tax Regs.] Definition of gross estate; valuation of property. * * *
(b) Valuation of property in general. The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044↩ is its fair market value at the time of the decedent's death, except that if the executor elects the alternate valuation method under section 2032, it is the fair market value thereof at the date, and with the adjustments, prescribed in that section. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulson to buy or to sell and both having reasonable knowledge of relevant facts. The fair market value of a particular item of property includible in the decedent's gross estate is not to be determined by a forced sale price. The value is generally to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of the property. For example. in the case of shares of stock or bonds, such unit of property is generally a share of stock or a bond. Livestock, farm machinery. harvested and growing crops must generally be itemized and the value of each item separately returned. Property shall not be returned at the value at which it is assessed for local tax purposes unless that value represents the fair market value as of the applicable valuation date. All relevant facts and elements of value as of the applicable valuation date shall be considered in every case. See §§ 20.2031-2 to 20.2031-8 for further information concerning the valuation of particular kinds of property.
2. SEC. 2056. BEQUESTS, ETC., TO SURVIVING SPOUSE. (a) Allowance of Marital Deduction. - For purposes of the tax imposed by section 2001, the value of the taxable estate shall, except as limited by subsections (b), (c), and (d), be determined by deducting from the value of the gross estate an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse, but only to the extent that such interest is included in determining the value of the gross estate.↩
3. (e) Definition. - For purposes of this section, an interest in property shall be considered as passing from the decedent to any person if and only if - * * *
(7) such interest consists of proceeds of insurance on the life of the decedent receivable by such person.↩